IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DANIEL HARDER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. 05 C 5800 |
| ) | |
| VILLAGE OF FOREST PARK, et al., ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Daniel Harder seeks court administrative review of the Village of Forest Park's Board of Fire and Police Commission's (the "Board") decision to terminate his employment as a police officer for the Village. The Board's decision came after an evidentiary hearing on ten charges of misconduct brought by the chief of police, James Ryan, against Harder. The Board sustained all charges and held that termination was appropriate. Harder argues that the factual record did not support the charges, sufficient cause did not exist to terminate him, and the Board's decision rested on patently illegal charges and was in violation of the Board's own rules and regulations.

## BACKGROUND

On June 14, 2005, Ryan placed Harder on administrative leave, with pay, and on August 18, 2005, initiated termination proceedings before the Board pursuant to 65 ILCS 5/10-2.1-17. Charges 1, 3-8 and 10 of Ryan's 10-count statement alleged violations of various paragraphs of General Order #114. Charge 2 alleged conduct unbecoming an officer, and charge 9 alleged a violation of the Village employee personnel manual.

The first seven charges arose from a single incident in roll call, where Harder allegedly

called a subordinate officer, Officer Lee, a "fucking idiot" multiple times, after Lee initially declined to follow an order to take a call (the "roll call incident"). Charges 8 and 9 involved Harder's use of sick time. Charge 9 alleged that Harder abused his sick time by accruing frequent and excessive absences - calling in sick 21.5 days in 2004 and 54.5 days in the first half of 2005.[1] Charge 8 involved a phone conversation between Ryan and Harder on June 10, 2005, a day Harder had called in sick (the "June 10 phone call"). Ryan charged Harder with lying regarding his whereabouts during that phone call.

Charge 10 involved three allegations of lying, specifically that Harder lied in his formal interrogation (the "internal investigation") about the roll call incident, the June 10 phone call, and another conversation Harder allegedly had with a fellow officer, Sergeant Murphy, in which Murphy had threatened Harder (the "Murphy incident"). On June 9, 2005, Harder had reported to his superiors an alleged conversation he had with Murphy, where Murphy inquired as to whether Harder had posted certain comments about him on the Forest Park website. According to Harder, Murphy then threatened him by referring to a "bogey-man," that "had not come out of him in a long time," but would come out if he found that Harder had been involved in posting the offending comments. Harder was questioned about this incident during his internal investigation. Murphy was then interviewed and denied having had such a conversation with Harder. Ryan charged Harder with lying during his internal investigation about this alleged conversation.

On September 1, 2005, the Board suspended Harder without pay, pending the outcome of the termination hearing. This suspension was predicated on the substance of Ryan's

---

[1] The number of alleged sick days in 2005 included days Harder was off pursuant to the Family Medical Leave Act, but that fact was not documented in the charges. The charges were later amended, omitting Harder's FMLA absence, and citing 11.5 sick days in 2005.

charges, including Harder's sick time, taken pursuant to the FMLA.

After the suspension, but prior to the termination hearing, Harder filed a complaint in this court under Title VII of the Civil Rights Act, seeking a temporary restraining order and preliminary and permanent injunctions, to prevent the Village from terminating his employment and from engaging in further retaliation against him. This court declined to issue an injunction, finding that there was no immediate threat of irreparable harm. We further granted the Board's motion to intervene pursuant to Federal Rule of Civil Procedure 24(b). On March 9, 2006, Harder amended his complaint to allege one count of Title VII retaliation, two counts of § 1983 violations, and an FMLA claim.

Harder's termination hearing took place over the course of eleven months from November 3, 2005 to October 12, 2006. Harder was represented by counsel, and more than 30 witnesses were called to testify. On March 5, 2007, the Board issued a written opinion terminating Harder's employment. The decision was 2-1, with one commissioner dissenting from the termination order. The Board unanimously upheld nine of the ten charges, upholding charge 9 by a 2-1 vote. On April 4, 2007, Harder, with leave of this court, filed his second amended complaint and added a claim for administrative review of the Board's decision. This is the only claim for relief implicating the Board.

## ANALYSIS

We may review the Board's decision pursuant to our exercise of supplemental jurisdiction under 28 U.S.C. § 1367. The Board's decision is reviewable under the Administrative Review Act (the ARA). 735 ILCS 5/3-101; 65 ILCS 5/10-2.1-1.7; Burgess v. Bd. of Fire & Police Comm'rs., 275 Ill. App. 3d 315, 320 (Ill. App. Ct. 1995). Under the ARA we review the Board's termination decision in two steps, first deciding "whether the [Board's]

finding of guilt is contrary to the manifest weight of the evidence," and then whether the findings of fact support its conclusion that cause existed for discharge. Ehlers v. Jackson County Sheriff's Merit Comm., 183 Ill. 2d 83, 697 N.E.2d 717, 720, 231 Ill. Dec. 932 (Ill. 1998) (citations omitted).

## The Board's Findings of Fact

The Board's findings of fact "shall be held to be *prima facie* true and correct." 735 ILCS 5/3-110 (West 1996). Therefore, on administrative review our sole inquiry is whether the findings are against the manifest weight of the evidence. We do not resolve factual inconsistencies, nor do we re-weigh the evidence. Launius v. Board of Fire & Police Commissioners, 151 Ill. 2d 419, 427-28, 603 N.E.2d 477, 177 Ill. Dec. 407 (1992). The Board's decision will be held to be against the manifest weight of the evidence "only if the opposite conclusion is clearly evident." Abrahamson v. Illinois Department of Professional Regulation, 153 Ill. 2d 76, 88, 606 N.E.2d 1111, 180 Ill. Dec. 34 (1992). The fact that a contrary conclusion is reasonable, or that the court would have ruled differently, does not authorize reversal of the Board's decision. *Id.* at 88. The court must not substitute its judgment for that of the administrative agency; rather, if the record contains evidence to support the agency's findings, its decision should be affirmed. *Id.*

## The Roll Call Incident

The Board sustained charges 1-7 against Harder, finding sufficient evidence in support. The substance of each charge is as follows:

1. General Order No. 114(II)(C): "Employees, whether on duty or off duty, will follow ordinary and reasonable rules of good conduct and behavior.... And, they will follow established policies and procedures and use sound judgment in carrying out their duties."

    2. Conduct Unbecoming a Police Officer: Conduct unbecoming a police officer is conduct that impugns the integrity of the police officer or the Forest Park Police Department.

    3. General Order No. 114(II)(E)(1): "Employees will: be courteous to others (employees and the public at large)."

    4. General Order No. 114(II)(E)(3): "Employees will: prevent their emotions from interfering with their duties."

    5. General Order No. 114(II)(E)(4): "Employees will: use patience and discretion."

    6. General Order No. 114(II)(E)(6): "Employees will: when performing their duties avoid using coarse, violent, profane or insolent language or gestures."

    7. General Order No. 114(III)(A): "Employees shall treat other department members with respect, courtesy and civility."

The evidence presented at the hearing was more than sufficient to sustain these charges. Every witness called to testify about the roll call incident testified that Harder called Lee a "fucking idiot" on more than one occasion during the incident. Lee testified that the comment made him feel degraded. In his testimony, Harder admitted to making the statement, and admitted that his conduct violated the above-cited provisions.[2]

Harder argues that the record does not support upholding the charges because testimony demonstrated profanity is an every-day occurrence within the department, and there was some testimony that by initially refusing to take the call Lee was defying a direct order. While true, both of these arguments go to the weight of the punishment for the offense,

---

[2] Harder admitted that in making the statement he was wrong, discourteous, and he failed to use sound judgment. He admitted that he failed to prevent his emotions from interfering with his duties, use patience with Lee and avoid using coarse and profane language. He further admitted that he failed to treat Lee with respect and civility, and that making such a statement was unbecoming of an officer (Admin Rec. 254-55).

not to whether the offense occurred. The record testimony, coupled with Harder's admissions, are sufficient evidence of his guilt and therefore the Board's decision to uphold charges 1-7 was not against the manifest weight of the evidence.

### The June 10 Phone Call

The Board sustained charge 8, a violation of General Order No. 114(II)(F), which required that "Employees will be truthful." The Board found that Harder was untruthful in a conversation with Ryan regarding his whereabouts on June 10, 2005, when he called in sick. It credited Ryan's recollection of the conversation, finding it convincing. It found that Harder had deceived his wife into thinking he was working, but he had, instead, gone to the home of another officer, Sergeant Crawley. The Board further found that Harder lied when he told Ryan he had been driving around for hours, yet failed to disclose that he had been at the other officer's home.

While not permitted to re-weigh the evidence, or make credibility determinations, this court feels compelled to at least comment on the evidence presented. Ryan testified that he held this conversation with Harder while on his cell phone, on his way with his wife to the Village summer festival that evening. Nevertheless, he testified that he recalled and wrote down the conversation *verbatim* the next morning, anticipating that he would use it in filing charges against Harder. Ryan destroyed those notes once he memorialized the conversation in the formal charges. We find such testimony suspicious, at the very least. Nevertheless, we conclude that it was reasonable for the Board to believe that Ryan could recall the conversation word-for-word.

Second, Ryan repeatedly mentioned the fact that Harder had lied to his wife about his whereabouts on June 10. The Board noted this fact in its decision. To what extent this

testimony had any effect on the Board's decision, we do not know, and we mention it only to note that we do not believe a police officer lying to his or her spouse is in any way actionable by the department. We do not find that the Board interprets General Order 114 as requiring truthfulness in every situation, nor do we find such an interpretation feasible.

That being said, we are not permitted to reverse the Board's finding simply because this court might have come to a different conclusion. Because the Board's credibility determination is not against the manifest weight of the evidence, where the evidence need only be proven by a preponderance, we find no error in the Board's sustaining of charge 8.

## Abuse of Sick Time

The Board sustained charge 9, a violation of the Village personnel handbook, which provided in pertinent part that "[a]ll employees are expected to report to work on their scheduled work days...Frequent or excessive absence is grounds for discipline, up to and including discharge." The Board found that Harder abused sick time by accruing 22.5 sick days in 2004 and 9.5 sick days in the first half of 2005.[3] It credited the testimony of Ryan that Harder was using sick days to expand his time off and that Harder's conduct had a negative impact on the efficiency of the department and the overtime budget. Commissioner Garlisch dissented from the Board's finding, noting that Harder did suffer from health problems during the period of time in question, and believed that Ryan did not carry his burden as to the proof of abuse. Garlisch further found that the sick time utilized was neither frequent nor excessive under the circumstances.

We agree with Garlish that Ryan did not carry his burden as to the proof of abuse. The

---

[3] The Board found that Harder was absent 9.5 days in 2005, whereas the Chief's statement of charges alleged 11.5 days.

statement of charges lists the offense as "frequent or excessive absence" and notes only that Harder utilized 22.5 days in 2004 and 9.5 sick days in 2005 (Admin. Rec. 460). It was established that Harder was entitled to 80 sick days a year (Admin. Rec. 293). In his testimony, Ryan stated that a pattern developed where Harder was taking certain sick days near to or in conjunction with his regular time off, thereby increasing the total amount of time off. Ryan never introduced any evidence to demonstrate that Harder was not actually sick on the days that he used sick time. In fact, while the Board argues that it rejected Harder's contention that he was sick on those days, counsel for Ryan explicitly stated that Ryan was not claiming that Harder was not sick, but only that the amount of sick days used was excessive (Admin. Rec. 296). However, the police department's own leave policy does not support a finding of excessive use of sick time where the officer was actually sick (Admin. Rec. 2406-2407).[4] Since Ryan did not attempt to offer any evidence to rebut Harder's testimony that he was sick on the days in question, his use of sick time could not be found excessive.

Further, the fact that Harder was not at home when Ryan called on June 10, 2005, does not, by itself, demonstrate that he was not ill. As the Seventh Circuit noted in Pienta v. Village of Schaumburg, 710 F.2d 1258 (7th Cir. 1983),

> [A]n employee injured with a broken arm may not be able to report even for restricted duty desk jobs, but he is perfectly able to go to church or to court on a parking ticket. An employee with the flu may not qualify even for restricted duty but is perfectly able to leave the house to pick up his child at school if she gets sick or injured and suddenly has to come home.

Yet, even if the Board could have found that Harder was not sick on June 10, that is only one

---

[4] General Order 507: Leave Policy, states that "All sick time investigations shall be cleared with one of the following clearances: (a) Excused - the employee provided sufficient evidence and/or documentation to justify his/her sick leave usage; (b) Unexcused - the employee has failed to provide sufficient evidence and/or documentation to justify his/her sick leave usage." (Admin. Rec. 2407).

day of the many that he is alleged to have abused. Ryan put forth no evidence demonstrating that Harder was not sick on the other days.[5]

In addition, it was established that Harder sought, and was granted, FMLA leave during a large portion of early 2005 because of his medical problems. Again we note that Ryan explicitly stated that he was not contending that Harder was not actually sick on the days in question. Regardless, the Village argues that Dr. Woody found Harder "fit for duty," belying his assertion that he was sick.[6] Dr. Woody testified, without contradiction, that:

> When I wrote fit for duty it meant that I felt he was physically qualified to do his job that day. Under my plan, my recommendation was also that he have a second surgical opinion, because I didn't feel that he had been appropriately evaluated and treated, and I thought that appropriate treatment for this condition would possibly require time away from work.

(Admin. Rec. 663).

This undisputed explanation for Dr. Woody's diagnosis of "fit for duty" is further evidence of the legitimacy of Harder's sick time use. That evidence was not contradicted by Ryan and, indeed, he never sought to contradict it. On this record we find that no reasonable person could agree with the Board that Harder abused sick time when he took 22.5 days off

---

[5] Anthony Calderone, the mayor of the Village of Forest Park, seeks admission of certain phone records collected reflecting numerous phone calls between Harder and Sergeant Frawly, arguing that those phone records demonstrate Harder was abusing his sick time. Calderone contends that even though these records were not admitted in the administrative hearing, they are properly part of the record on appeal because they and the motion seeking their admission are contained in the physical administrative record. We disagree. "Agencies have broad discretion in conducting administrative hearings." Wilson v. Department of Professional Regulation, 344 Ill. App. 3d 897, 907 (2003). "An administrative agency's decision regarding the conduct of its hearing and the introduction of evidence is properly governed by an abuse of discretion standard and subject to reversal only if there is demonstrable prejudice to the party." Id. The Board declined to admit these records, and they are only present in the record in order to permit this court to review their admissibility upon the motion of a party. We find the Board did not abuse its discretion in excluding the records, and Calderone does not so argue. Since the records are not part of the evidence before the Board, we decline to review them for purposes of this motion.

[6] On January 21, 2005, Harder was ordered by the village to be evaluated by Dr. Woody due to his extensive use of sick time.

in 2004 and 9.5 days off in 2005, where there is no allegation or evidence that he was not sick during that time, and where the sick time used was not in excess of the amount allotted to him. We reverse the Board's finding as to charge 9.

## The Internal Investigation

The Board sustained charge 10, which was another violation of General Order 114 requiring officers to be truthful. The Board found that Harder had failed to be truthful during his internal investigation as to the roll call incident, the June 10 phone call, and the Murphy incident. This formal investigation arose after the June 10 phone call, though an investigation about the roll call incident was already underway. During that phone call, Ryan orally placed Harder on administrative leave. This was followed four days later by a letter from Ryan confirming that a formal investigation had been instituted against Harder for the roll call incident, as well as the June 10 phone call (Admin. Rec. 2594). Harder was called for a formal interrogation by Ryan's counsel, at which time he was questioned about both incidents, as well as the Murphy incident (Admin. Rec. 2354-90). When the formal charges were filed, Harder was charged with three instances of lying at his interrogation. As to the roll call incident, Harder had stated during his interrogation that Lee had called him a "jag-off" and said that Ryan "will be hearing about this." The Board credited the testimony of several other officers, who stated that they never heard Lee make either of those comments to Harder. Harder also stated in his interrogation that Lee was obsessed with the fact that Ryan was "hunting" Harder and another officer, and made frequent statements about it. The Board found the testimony of other officers discredited Harder's statements, and that the one officer who corroborated Harder's testimony at the hearing, Officer McClintock, had earlier stated that Lee did not make such comments. The Board chose to believe McClintock's earlier

statement, taken immediately after the incident, rather than one taken more than a month after the incident. The Board found that the weight of the evidence supported Ryan's allegation that Harder was untruthful about his characterization of the roll call incident. Upon review of the record we find that the Board's determination was not against the manifest weight of the evidence.

The Board held that Harder had been untruthful when asked about the Murphy incident. The only other person who had been interviewed to determine whether this conversation took place was Sergeant Murphy himself. The Board found Murphy's hearing testimony credible. It determined that the conversation never occurred, that Harder's testimony was incredible, and that the evidence Harder presented was merely part of a pattern of attempts to attack Murphy's integrity through collateral evidence. While we are skeptical of the Board's succinct conclusion that Murphy's testimony was credible, given the bulk of the testimony of record,[7] we note there was also other evidence that the Board could have relied on in sustaining the charge. A call log produced by Ryan indicated Murphy was still out on an official call at the exact time Harder had alleged the conversation took place. Harder cross-examined this log, noting that he had only estimated the time of the conversation, and that the call ended within fifteen minutes from that estimate (Admin. Rec. 741). However, the Board's weighing of that evidence is clearly something we do not disturb. Therefore, putting Murphy's

---

[7] Harder attempted many times to attack Murphy's credibility through the testimony of other witnesses. While the theme of dishonesty was certainly woven throughout these officers' testimony, the Board was correct in determining that the bulk of the testimony was collateral in nature – relating to specific bad acts that Murphy had engaged in (Admin. Rec. 1085-86, 1093-1100, 1101, 1105, 1110, 1123-25, 1493). Only twice did Harder's counsel attempt to properly impeach Murphy's credibility through the opinion testimony of Lt. Cody. When counsel first attempted to elicit Cody's opinion, the Board improperly excluded that testimony (Admin. Rec. 1556-57). Counsel was subsequently able to elicit from Cody that Murphy had a reputation for not telling the truth (Admin. Rec. 1560). However, this testimony is not enough to allow this court to find the Board's decision against the manifest weight of the evidence, especially in light of the fact that this same witness testified on cross-examination that he had no reason to believe Murphy was lying about this particular incident (Admin. Rec. 1561).

credibility aside, we cannot say that the Board's sustaining of charge 10 on this point was against the manifest weight of the evidence.

The Board also found that Harder was untruthful in his interrogation when asked about the June 10 phone call. It found Harder had failed to disclose his whereabouts and the true circumstances for his calling in sick that day. The Board did not cite any specific statements that it felt were untruthful. However, Harder's responses in the interview were similar to his testimony at the hearing, in that his recollection of the conversation differed from Ryan's in certain respects. As stated above, the Board's finding was based on a credibility determination and we cannot say it was against the manifest weight of the evidence. Therefore, over all, we find the evidence supported the upholding of charge 10.

<u>Harder's Retaliation Defense</u>

Harder presented a retaliation defense to the Board, which was rejected. While not specifically arguing that the Board erred, Harder repeatedly cites retaliation as the reason for his discipline and termination. Therefore, we address whether the Board erred in rejecting Harder's retaliation defense.

Harder had been a dedicated member of the police department for over 20 years, and in that time had been a highly respected and decorated officer who had instituted a number of community programs. His attendance record was stellar and his disciplinary record almost non-existent, until the time of Ryan's tenure. The former police chief, Ed Pope, had resigned after Harder brought his sexual harassment claim against him and the Village. Ryan was his replacement. From his very first day, Ryan singled Harder out for discipline. For example, almost immediately, Ryan forced Harder to take over a month of leave to reduce his time-coming bank, and then, upon his return to work, removed him from his position as a detective.

Ryan further reprimanded Harder on numerous occasions, for offenses ranging from lying in a report, in which Harder specifically asked that his word not be taken as truth, but that the incident be investigated (Admin. Rec. 54; 2651), to an incident where Harder used the word "jag-off" in front of a female officer (Admin. Rec. 55).

Harder attempted to establish that this barrage of discipline stemmed from his sexual harassment claim against the Village. For example, the evidence demonstrated that Harder's sexual harassment claim led to the resignation of the former police chief, who was replaced by Ryan. Harder also offered evidence that one of the officers put in charge of his internal investigation (Cody) was the very officer previously convicted of battery of a fellow officer – charges which formed the basis for Harder's sexual harassment claim. Ryan testified that he was not aware of the specifics of Harder's claim, nor was he aware of the role Harder played in the charges against Cody (Admin. Rec. 1188-89). We find it extremely improbable that an incoming police chief would be unaware of the reason for the former police chief's resignation. For the same reasons, we find it incredible that Ryan did not know the history of the officer he put in charge of Harder's internal investigation. Nevertheless, the Board credited Ryan's testimony, and as much as we would wish to re-evaluate that determination, we cannot. It is possible that the Board could have found that Ryan and Harder just did not get along, and that was the reason for the friction between them – the increased discipline and Harder's eventual termination. While we find a wealth of evidence in the record to support a retaliation defense, we are unable, due to our deference to the Board, to say that the Board's rejection was against the manifest weight of the evidence.

The Board's Order of Discharge

We must still determine whether the Board ruled correctly– that the appropriate

sanction was discharge. In other words, whether cause existed for Harder's termination. Illinois courts have defined "cause" as "some substantial shortcoming which renders the employee's continuance in office in some way detrimental to the discipline and efficiency of the service and which the law and sound public policy recognize as good cause for his no longer holding the position." Kreiser v. Police Board, 40 Ill. App. 3d 436, 441, 352 N.E.2d. 389 (Ill. App. Ct. 1976) *aff'd and remanded* 69 Ill. 2d 27 (1977). Unlike findings of fact, the Board's determination of cause is not *prima facie* true and correct. Christenson v. Bd. of Fire and Police Comm'rs, 83 Ill. App. 3d 472, 404 N.E.2d 339, 341-42 (Ill. App. Ct. 1980). Instead, it is subject to judicial review and will be overturned if it is trivial, arbitrary or unreasonable. *Id.*; Burgett v. Bd of Fire and Police Comm'rs., 149 Ill. App. 3d 420, 500 N.E.2d 951 (Ill. App. Ct. 1986).

"In disciplinary proceedings against a police officer, a single valid finding of a violation of departmental rules will authorize dismissal." Kinter v. Bd. of Fire of Police Comm'rs, 194 Ill. App. 3d 126, 134 (Ill. App. Ct. 1990). Therefore, even holding that the Board erred in finding sufficient evidence to support charge 9, we may nevertheless uphold Harder's termination, so long as it is not arbitrary or unreasonable, and is supported by the remaining charges. However, we find that it is both arbitrary and unreasonable.

First, we find arbitrary the Board's decision due to uncontroverted evidence of selective enforcement of the rules and regulations in question. Fox v. Illinois Civil Service Commission, 66 Ill. App. 3d 381, 392 (Ill. App. Ct. 1978). The record reveals that no other officer had ever been at risk of losing his or her job for swearing at another officer, either in jest or in seriousness (Admin. Rec. 345, 526, 918-23, 1078). At most, the testimony revealed two instances where officers were disciplined for swearing. Both resulted in minor discipline - a

written reprimand in one case, a referral to a judo class in another (Admin. Rec. 371, 1030-33) No officer had been suspended, let alone terminated, for the use of profanity in the department, even when it is done by a superior officer to a subordinate officer (Admin. Rec. 361).

The Board argues that this case is not simply about an instance of profanity, but that, in addition, Harder lied to Ryan about this incident – the Murphy incident – and where he was on his sick day. Numerous Illinois courts have been faced with determining when an officer's dishonesty warrants dismissal. While not creating a bright-line rule, they have generally separated the lies into two categories: those which relate directly to the officer's public duties and those which only relate to internal police administration. Kupkowski v. Bd. fo Fire and Police Comm'rs., 71 Ill. App. 3d 316, 324-25, 389 N.E.2d 219 (Ill. App. Ct. 1979). The former warrant termination, the latter do not. The "key factor" is "the subject matter of the falsehood, more specifically, how it relates to a policeman's duties to the public." *Id.* Examples of lies that relate to an officer's public duties include falsely characterizing grand jury testimony, lying during an internal investigation regarding whereabouts and actions during an emergency police call, lying about damage to a squad car, lying to an FBI agent during an official investigation, lying on an employment application, lying that a judicial order existed reinstating the officer to work, and falsely denying romantic relations with a felon. *See* Noro v. Police Board, 47 Ill. App. 3d 872, 365 N.E.2d 419 (Ill. App. Ct. 1977); Thanasouras v. Police Board, 33 Ill. App. 3d 1012, 339 N.E. 2d 504 (Ill. App. Ct. 1975); Mihalopoulos v. Bd. of Fire and Police Comm'rs., 60 Ill. App. 3d 590, 376 N.E.2d 1105 (Ill. App. Ct. 1978); Kupkowski, 71 Ill. App. 3d at 325; Merrifield v. Ill. State Police Merit Board, 294 Ill. App. 3d 520, 691 N.E.2d 191 (Ill. App. Ct. 1997); Valio v. Bd. of Fire and Police Comm'rs., 311 Ill. App. 3d 321, 724

N.E. 2d 1024 (Ill. App. Ct. 2000); DeMauro v. Loren-Maltese, 2001 U.S. Dist. LEXIS 12409 (N.D. Ill. Aug. 15, 2001). Examples of lies relating to internal police administration mostly involve lying about attending to personal business while on duty; testifying in one's own divorce proceeding, but telling a supervisor that it was official business; falsely denying driving an unlicensed personal car while on duty; and falsely stating that the officer's reason for leaving in his squad car while on duty was to transport his stranded family, when he was actually attending to his race horses. See Humbles v. Bd. of Fire and Police Comm'rs., 53 Ill. App. 3d 731, 368 N.E.2d 1049 (Ill. App. Ct. 1977); Kreiser v. Police Board, 69 Ill. 2d 27, 370 N.E.2d 511 (Ill. 1977); Christenson, 83 Ill. App. 3d at 478.

The Village asserts that these lies bear directly on Harder's ability to remain a police officer. We disagree. Upon review of these cases, we find Harder's falsehoods relate solely to internal police administration, and have no bearing on his duties to the public. Harder lied about his whereabouts during a sick day, mischaracterized a conversation between him and another officer during roll call, and lied that he was threatened by a fellow officer. The substance of these falsehoods do not directly relate to Harder's public duties as a police officer, nor are they lies resulting from official police business, and therefore do not warrant termination.

We note two additional considerations supporting our reversal of the Board's sanction. First is Harder's long and distinguished career in the force – more than twenty years of service, that included numerous commendations and awards, promotions and appointments. Second, we note Ryan's complete lack of use of progressive discipline. As stated above, during the June 10 phone call, Ryan placed Harder on administrative leave, prior to the outcome of any investigation of any of the charged incidents. Ryan testified that he believed he used

progressive discipline when he allowed Harder to respond to the charges. However, this response was in the form of a formal interrogation, and Harder remained on administrative leave at that time. The lack of progressive discipline in this case, as noted by Garlisch, further supports the finding that termination was unreasonable in this case.

In sum, we hold that Harder's misconduct was not so serious as to warrant termination. We remand the matter to the Board for consideration of what action should be taken, other than discharge, in light of this court's findings.[8]

## CONCLUSION

For the foregoing reasons, we sustain the Board's findings of fact in charges 1-8 and 10, reverse as to charge 9, and remand for the imposition of a sanction short of discharge.

JAMES B. MORAN
Senior Judge, U. S. District Court

May 2, 2008.

---

[8] We defer discussion of the amount of back pay to which Harder is entitled until the Board determines the appropriate sanction.